Case No. 21-15-16 Amerishore Insurance Company v. Selective Insurance Group Mr. Fitzpatrick, whenever you're ready. Good morning, Your Honors. May it please the Court, Brendan Fitzpatrick, Counselor for the Appellant, Amerishore Insurance Company. Your Honors, I'd ask this Court to reverse the District Court's decision and find that Selective's policies, not only the CGL, but its umbrella policy, come before Amerishore's policy in the underlying action. When the Courts are looking at the priority of coverage or what policy comes next, it is important to look not only at the policy language in each of the policies, but also the underlying facts as well as the underlying contracts, because that will dictate the intent of the parties that are entering into these agreements. And in this case, what you have is a subcontractor obtaining insurance based upon the provisions of the subcontract. And the subcontract, in this case, found at 1791 to 1795. In Section 4, 1793, the insurance procurement provision in that says that C&D, which is Selective's insured, is to procure primary and umbrella, but it's supposed to be on a primary and non-contributory basis. The umbrella coverage is supposed to be at least as broad as the primary general. And, Your Honors, we submit that that supports the interpretation that the policy that was procured should follow the Selective's CGL policy, and Amerishore's policy should come after Selective's umbrella. What does that phrase have to do with risk? Doesn't that phrase have to do with as broad as means that covers the same risk? It doesn't deal with the prioritization of the policies, does it? Well, I think, Your Honor, when you look at all of the evidence, it does fit within the fact that C&D, as a subcontractor, was required to obtain insurance, primary and umbrella insurance, to cover EDC, and that's what happened here. So, the question is, what comes next? And I think when you look not only at the contracts for the intent of the parties, then you look at- The way I look at it is, and maybe this is wrong, I mean, I look at it just as a natural way, that the underlying CGL policies go first, and then the umbrellas, and they go in a sequence, within each layer, at each layer. But, there may be a way that the parties have contracted around that. You're suggesting that the language that you just read was that the umbrella is to be as broad as the underlying CGL policy, the first policy, is that contractory language. But, that language deals with, it seems to me, covering the same risk, albeit at a different level, and not the priority. It doesn't speak to priority. Well, I think when it says as broad as, it has to go back to what's required. It's supposed to be on a primary and non-contributory basis. That's what that provision states in the underlying subcontract. And, I think when you look at the policies, that's what was procured. The Amerishores policy, the endorsement that the Supreme Court relied upon, and that what my learned counsel stated in his recent letter application, that was deleted in pages 16, 23. That was deleted by the subsequent amendment. Well, what they say is that it was deleted as to certain parties, not as to the original parties. Now, to the extent you don't agree with that, I'm eager to hear what you have to say. But, that's their argument. I understand that that's their argument raised for the first time in that. Well, we asked the question, and we got an answer to our question from them. But, Your Honor, it wasn't just deleted with respect to what counsel's claiming. It was deleted. Paragraph 4 was deleted. Well, why should we assume that's what it means? I mean, this is a provision being entered into for the benefit of certain entities, and they say it doesn't affect the original. And, the logic of that would be, otherwise, these other entities would be in a better position than the original parties, which would be curious. I don't believe so, Your Honor. I think when, again, with respect to even the provision, the other insurance provision at 1644, you again refer back what was the intent of the parties in the first place. The intent of the parties in the first place was to have a subcontractor obtain a CGL policy and an umbrella policy that covered the underlying accident. Well, let me ask you about that, the original intent. The cited sections require C&D to assume obligations toward EDC, not toward the owners, right? I believe that was an issue that we submit that it does apply to the owners as well, but I think with Well, EDC is obligated to the owners, but I'm not sure that I saw that C&D was obligated. Well, the contract incorporates the main agreement, the subcontract with C&D incorporates all the provisions, the general responsibility, the general requirements, all of that. That's what all of the testimony from Ms. Reschedeff, who is C&D's president, Mr. LaFace, who is C&D's vice president, they had an attorney look it over. She signed, she initialed all the places where it said it was being incorporated, all the underlying provisions. So I don't believe there's really any debate that they believe that the owners were going to be covered as well by this policy. And so- Well, but the language of it, which is where we started, C&D has to assume toward the contractor, so their obligation is toward the contractor. All the obligations that the contractor assumes toward the owner. So that's why I'm suggesting to you that the contractor has the obligations toward the owner. And however broad they are vis-a-vis the owner, C&D has to assume the same breadth of obligation toward the contractor. What am I missing? I believe it's not only towards the contractor, but as well as the owner. Why? That's not what the language is. It says C&D is to assume toward the contractor. I mean, we're just- You're trying to tell us what the party's originally intended, and I'm trying to see where that is in the language that they used. So help me out. The subcontract, page 1792. The subcontractor shall be bound by- 1791? 1792. I'm sorry. 1792. I just want to follow you along. So in section 1.9, the subcontractor shall be bound by the terms of the specifications, general conditions, and supplemental conditions, and addenda in the contract between the contractor and the owner, and shall conform and comply with the drawing specifications, and shall assume toward the contractor all the obligations, responsibilities that the contractor assumes towards the owner. They are assuming all the responsibilities in the original contract, which means that they are assuming all the responsibilities that CEDC- It's that very same phrase. It's preceded by the subcontractor conditions shall be- The subcontractor shall be bound by the terms of the specifications, general conditions, and supplemental conditions, and addenda, which deal with drawings, specs, and the scope of the work. That's what that part of it says. Now, they could specify that better in the following phrase, but it says shall assume toward the contractor all the obligations that the contractor assumes towards the owner, and those obligations and responsibilities were just spelled out in the earlier part of that sentence. And they don't deal with insurance. Well, the general conditions and the requirements that the owner owes- that EDC owed to the owners did include indemnification, did include insurance procurement, and so I believe that when CED entered into this contract and agreed to be bound by all the conditions of the main contract with the owners, they agreed to be bound by the indemnification and insurance procurement provisions, which, again, all of their witnesses testified that they read it, they signed it, they agreed to be bound by it. Before you sit down, can I ask you a question about the applicability of century maturity? In particular, what's the status, I guess, between the parties to the forcibility of the indemnity agreement? That was found in the underlying action, the Atkinson action. It was found to be void under Virginia law. Now, we weren't a party to that. There's no argument, and I don't believe it has any res judicata or collateral estoppel effect on the carriers. We believe that was a wrong decision. We pointed out that the law that we believe is applicable, which is New York law, with respect to the indemnification provision, because the underlying case is settled, that essentially right now the court found that it was void under Virginia law. We disagree with that. We believe New York law should have applied. So if it's settled, where does that leave us with respect to that? We're debating now. It's basically exactly like the arch insurance case, which the court, which this court cited to in century surety, which had the carrier settle the underlying action. In that case, arch settled, which was the primary for the owners. Nationwide was the primary and the excess for the subcontractor. It settled for $1.95 million. Nationwide had the first million, just like in this case. They put up their million. Arch put up $950,000. And then they commenced a DJ to try and recover that money. And in that case, the first department, because there was an indemnification agreement as well as insurance procurement, the requirements and the court found that arch was entitled to recover the $950,000 from nationwide. Counselor, you didn't make that argument in your principle brief. You made it for the first time in your reply brief. And then you made it again in the letter. But why isn't it waived because it wasn't raised initially? I'm sorry, Your Honor. I just didn't hear the first part of your question. I'm sorry. The indemnity argument that you're making, indemnity pass-through argument that you're making, waived by the fact that it wasn't in your initial brief. It was only in your reply brief and in your later supplemental brief. Respectfully, Your Honor, we cited to Century Surety. We recited to Arch in our main brief. You cited to those cases, the underlying cases, but you didn't make the same argument. The argument was fleshed out in full in your reply brief. I respectfully disagree, Judge Walker. I believe we extensively cited to not only Arch but also Century Surety and argued that because there is an indemnity agreement here, that supports the intent of the parties that the selective policies would come next, not Amerishores. May I just ask you, if we were to get to the point of having to balance the policies as the New York Court of Appeals discusses to determine their priority, or not balance them but try to determine their priority, why don't the factors that are identified by the Court of Appeals as relevant tilt in favor of your adversary? I mean, they talk about the type of premium that's being paid, whether it signifies that this is primary or secondary coverage, the language of the agreement here, the CGL policy, other insurance clause makes it clear that it can sometimes be priority. The selective umbrella coverage has no such language. I mean, why don't all these factors tilt in favor of prioritizing the policies as the district court did? Well, I think when you consider not only those factors but the factors that this court in Century Surety considered, as well as the first department in the Arch and indemnity cases that this court relied on, when you do consider the underlying contracts to also look at the intent of the parties, and again, in Arch there was nationwide had an umbrella policy, and the first department found that that stepped up next after its primary. Right, but that's upon balancing. I mean, this would get us to the point where we can't tell from the language alone what the intent of the parties was, which maybe we can, given your adversary's arguments, but I'm just giving you the opportunity to tell us why these factors tilt in favor of your client. I mean, as I understand it, the selective umbrella coverage, the premium was $11,676. That hardly sounds as if it's assuming primary coverage responsibility here. Well, technically it's not primary coverage here. It's stepping in after Selective's CGL policy. That's what the parties intended. C&D was required to get primary coverage and umbrella coverage. It did that. Those are the policies that should be required to cover the underlying action that resulted solely from the actions of C&D, and similar to, again, the facts in Arch where nationwide's excess policy stepped up next after its CGL. The facts in this case are similar as well as the intent of the parties. Thank you, Your Honor. Thank you. We'll reserve a couple minutes for Mr. Piper. Good morning, Your Honor. It's my pleasure to support Steve Piper on behalf of Selective Insurance Group Defendant Appellee. With the court's permission, I'd like to start with Judge Park's first question, which was the applicability, potential applicability of the Century Surety decision issued by this court just last fall. The reality is parts of that decision are, in fact, entirely applicable to this case. Other parts aren't. The court analyzed in Century Surety the first part of that decision says, look, the Century Surety policy here is a true excess umbrella policy. It is in exactly the same position as the Selective policy. And the court's decision in Century Surety, at least on the other insurance analysis, seemed to suggest that, look, Century is, in fact, excess of the Admiral CGL policy. It wasn't until the court then looked at the indemnity provisions. My colleague here is speaking about looking at the conditions and the considerations and the intent of the parties as a part that was discussed in Century Surety. That's not what's discussed in Century Surety. What's discussed is the applicability of the indemnity provision. That's what's discussed in Arch. That's what's discussed in the indemnity provision in the indemnity case from 2011 that the First Department cited. In all of those cases, there was a valid contractual indemnity provision at issue in the case. And the Second Circuit in Century Surety said, even though Century Surety may be the excess policy in this case, we don't do another insurance analysis. It's rendered moot by the risk transfer that's available under the contractual indemnity provision. That's not available here. Why is it not available here? Your Honor, it's been decided. EDC is a party to this litigation. They were a party to the underlying litigation. C&D LaFace is a party to this litigation. C&D LaFace was a party to the underlying litigation. It was fully and fairly litigated. The indemnity provision, Judge, runs from EDC to C&D LaFace. EDC doesn't possess a contractual indemnity provision against Selective. Selective's not a party to that contract. The parties who could litigate that case did, in fact, litigate that case. And they litigated it to conclusion. They got a decision. They elected to file an appeal in that case. And then they elected not to pursue that appeal. But I'll go one step further. And so how does that affect us here? How it affects the court here is that the second part of century surety is wholly distinguishable from the facts and circumstances here. Judge, recall in the docket in this case, EDC commenced and asserted a claim for contractual indemnification against C&D LaFace in this case and withdrew it with the understanding they would litigate it in the underlying action. It's earlier on in the case. I understand. Is your argument that it's res judicata or that this is distinguishable from century surety? It's both. It is distinguishable from century surety because the question of contractual indemnity has been fully, fairly litigated in the underlying action and is precluded from being visited again in this court or any other court, for that matter, that follows the rules of res judicata. I'm sorry, Judge. To be more precise, it may be collaterally estoppel, right? It may be collaterally estoppel. I think, Judge, at the risk of messing up this with my civil procedure teacher from a long time ago, I think you're right. It may be collateral estoppel. Either way, that issue, the contractual indemnity issue, has been fully and fairly litigated. They could have pursued an appeal in the underlying action. They could have pursued the lawsuit in this case. They elected to pursue it in the underlying action, and then they elected to not pursue the appeal and discontinue with prejudice the contractual indemnity claim against C&D LaFace. So that's the distinction, right? There is no contractual indemnity claim. So what we're left with here really is a pure insurance case. That's it. It's an AmeriShare CGL case and the selective true excess umbrella case. That's where we're left with trying to decide. And it can be decided by looking at one page on the record. Judge, you mentioned it earlier. It's 883 of the record. That's the provision of the selective policy, which clearly makes it an excess policy. It's excess over primary, over excess, over contingent, over any other policies that could be in play except for those that are written explicitly over the selective policy. All that's talking about is there's another layer above the selective policy. That doesn't exist here. What we have is a primary policy, and we have an excess policy. And the case law in the New York State Courts Health Division is overwhelmingly clear, and Judge Kahn got this at the district court. He cites the Sport Rock case from the First Department. There are others, as outlined in our brief. But Sport Rock lays out the principle that's been bedrock in New York insurance law for 40 years. A primary policy never passes an excess policy. It's because they're written on different levels. Courts already recognize that by the Lemuro case versus State Farm where they talk about the balancing factors. The primary issue, you don't even have to balance these because we've got an excess policy and a primary policy. And under Sport Rock, the analysis ends there. The only way around that, again, is this concept of contractual indemnification, which the court recognized in century surety, but that's not an issue in this case. So ultimately, we would submit Judge Kahn got it absolutely correct on the merits of this case. This case is a pure excess case. A manager is a pure CGL case or CGL policy, and it goes before and must exhaust before they get to the next layer, the excess layer of coverage. So I have a few minutes left. I will address, if the court wants to hear argument, I'll address the concept of who actually qualifies as an insured under the selective umbrella policy. That's certainly outlined in our brief as well. So we've established how the CGL policy applies and really the selective umbrella policy applies, and that really should be dispositive irrespective of this next part. But EBC isn't insured under the selective umbrella policy. It's because EBC asked to be insured under the selective insurance policy. EBC, in section 4.1 of the subcontract, makes sure, bless you, Your Honor, EBC secures its rights under the selective policy. Had EBC secured the rights of Cameron, Hinsdale, and Movie Tavern Theater, we would be having a different conversation. But they didn't. We want to talk about 4C and 4D. Look at the first part of clause 4. They're only talking about the contractor. That's the only entity they were seeking to secure coverage for. And so, well, you can't rely on the text of the agreement. And NARASHER has now gone into an agreement with C&D LaFace, nor selective or party to, and say, well, this document creates rights down the chain. It doesn't. But it's also well-trod law in New York. If you want to incorporate an insurance procurement obligation, you have to do so explicitly. And NARASHER doesn't even reference those cases in its brief. They don't talk about the Prasad v. Bova's case, which is in our brief, and they don't talk about the Boussinevich case in our brief. Both of those cases say you incorporate, by general incorporation, the character, quality, and scope of the work, the general conditions, but you do not incorporate, unless you explicitly try to do it, you do not incorporate additional insurance obligations or contractual indemnity provisions. And, Judge Walker, you picked up on this in your questions of my adversary earlier. The incorporation clause that they rely on in the C&D LaFace EDC contract incorporates scope, provisions, character, and specifications. That's what it's incorporating. By its plain language, that's what it's incorporating. If it was incorporating an insurance procurement clause, Your Honors, it would have said so. It didn't. So there's no basis for Movie Tavern Theater, Cameron Group, or Hinsdale Road to qualify as an additional insured. Before you run out of time, can I ask you about your supplemental letter and your reading of the other insurance endorsement? As I understand it, your argument applies only to the additional insurance, but it says it deletes and replaces. And so how do we read that together? It seems like it's deleting but not replacing. It's just sort of modifying part of it, and I don't really understand how that goes together. Thank you, Judge, and that was going to be my final point. It is exactly, we interpret it exactly the same way you just mentioned it. What it does, this language is found in a broad form of additional insured endorsement, right, in the policy. And that's creating coverage for those entities that EDC had an obligation to name as additional insureds. So within that endorsement, wholly within that endorsement, with respect to those entities so named, it's creating, it's making the policy excess for them. It's not making the policy excess for EDC. EDC bought a prime place, the original other insurance clause, which did apply to the primary. I understand that, Judge. I guess I would direct the court to the language actually of the blanket additional insured endorsement for what it's actually applying to. But I think the point is if the parties had intended what you're urging, wouldn't they have said that this other provision did not apply in the case of other insureds, not that it was deleted? That's the concern that I think we're asking you to address. Yeah, I appreciate that. I think these are foreign policies issued by the Insurance Services Office. It's incorporated. I think it's generally understood that it's modifying the additional insured clause. It's not overturning it. And the proof of the support really for my reading of that is in the language of the actual additional insured language. So, Your Honor, if I may, just let me read it. I'm sorry. I have to get to the right clause of my notes here. Any coverage provided in this endorsement, so it's tying back to this endorsement, is excess over valid and collectible other insurance available to the additional insured. It's addressing additional insureds. And maybe the language isn't as clear in the preamble as it could be. But the preamble of the endorsement under New York law does not change the facts and wording of the agreement later there under. In other words, whatever it says in the preamble doesn't change the plain language of the agreement. The plain language of the contract language here, it applies to the additional insureds, not the named insureds. And clearly EDC is the named insured on the AmeriShare policy. So it's our position that with respect to EDC, this language is inapplicable because they're not an additional insured. It cannot fit under AmeriShare's interpretation. You have to go back to the original scope of the agreement. And it doesn't make any sense that AmeriShare would have, that EDC would have purchased a primary policy from AmeriShare that then it would have lost primary coverage because it added someone as an additional insured. That's the argument AmeriShare's trying to make. And logically, it doesn't make any sense. They charge $46,000 for this premium. It's a primary policy for EDC. It provides primary coverage. Any other questions? Thank you, counsel. Thanks, Judge. Mr. Fitzpatrick, you reserve two minutes for rebuttal. Excuse me, Your Honors. Briefly, with respect to Lamoro and Sportcraft, which counsel relies on, you know, if you look at the facts in Lamoro, Lamoro dealt with auto policies, the primary auto policy and then a excess and umbrella auto policy that really, they weren't really connected. Here you have two policies that are specifically connected because they were specifically brochured for this project. And again, counsel debates that we should look at the original intent by looking at the contract, the underlying subcontracts. And I think that you can't escape looking at the underlying subcontracts when you're considering what the scope of coverage was and what they wanted to protect, what they wanted to purchase, and what the priority was going to be. So I think that the language in the CD, the C&D subcontract, it has to be, it was supposed to be a primary, not contributory, and it was supposed to be as broad as the primary. That's what was purchased here. And that's what was the intent of the parties where you would have a subcontractor being responsible for an accident which its employees were solely responsible for. With respect to the issue of the underlying... What do you, counselor, what do you do with the language in KX1495, which is elsewhere in the general contract, I think it's section 5.3, which says, by appropriate agreement, the contractor shall require each subcontractor, to the extent of the work to be performed, bound to the contractor by the terms of the contract documents, and to assume towards the contractor all obligations and responsibilities, including the responsibility for the safety of the subcontractor's work, which the contractor by these documents assumes, towards the owner and architect. There, the focus is not on insurance. There's nothing said about insurance. It's talking about obligations and responsibilities involving the work. The scope of the work. It's just supplemental. It's another, it's context in which you read this, for you to read the subcontractor. Well, I think the scope of the work is, essentially the scope of the work is what C&D was required to do. Any general supervisory authority that EDC had, again, that's not going to pose liability on it. It still would be vicariously liable for the actions of C&D's employees. But C&D's insurance procurement requirements, coupled with the indemnification agreement, set forth the intent of the parties with respect to what was supposed to be purchased. And I think what was supposed to be purchased here was two policies that were supposed to come before AmeriShore's CGL policy. I believe we've set forth our arguments with respect to the other insurance provision. But with respect to the underlying, Judge Park, that you mentioned with respect to the Virginia law applying. Again, AmeriShore was not a party of that action. I don't believe it has collateral or res judicata effect on us. I think that when you look at the law, it was wrongly decided. But, again, we weren't a party. I don't think that should have res judicata or collateral stop on us. On AmeriShore, that argument was never raised before. It hasn't been briefed. So I don't believe that it should be ruled upon here. Unless there are any further questions, my time is up. I would ask this court to reverse. Thank you both. Thank you. The next argument for today is in case number 2251. The cone, which is block 865, lot LLC. Good morning. May it please the court. My name is Lou Piconi. I'm here pro se. I came down for the brief five minute allotted time to highlight the importance of this case to the plaintiffs. I believe that the Rooker-Feldman doctrine is not applicable to the facts of this case because the plaintiff's damage was caused by the defendant's fraudulent recording of three forged deeds in 2014 that occurred well before the state court decision, which is not being appealed by the federal court district case. Before you touch on that, may I just ask, you said you came down, is that from Canada? Yes. And of what country are you a citizen right now? I'm a citizen of both the United States and Canada. So dual citizenship might not create diversity jurisdiction here. There may be a problem with this being in federal court. How do you deal with that? Do you know what I'm talking about? With regard to diversity jurisdiction, my residence has been in Canada for many years now. I know, but the law says that if you're a United States citizen living abroad, you're deemed to be a citizen of every state. And so to that extent, it doesn't confer diversity jurisdiction on the court, or at least there would be a question about that for us. Anything more you want to tell us about? Well, I am a resident of Florida. That is where I have my driver's license. Your primary residence is Canada? Yes. Okay. Is that your home in Canada, which you consider your home, your domicile there? I have many homes, Your Honor. I don't mean a house. I don't mean a house in that sense. The other question is pretty clear. If you are a domicile in Canada, you can't invoke the diversity jurisdiction. Your Honor, I can't hear you? If you're a U.S. citizen. I'm sorry, I didn't hear the question. If you are a U.S. citizen domiciled in Canada, the law is that you cannot invoke the diversity jurisdiction in federal courts. I would argue, Your Honor, that as a Florida resident with a Florida driver's license, if my home state would be Florida, then there would be diversity of jurisdiction. This isn't something that came up previously. There was no jurisdictional discovery or anything like that in this case? No. I interrupted. You wanted to get into the Rooker-Feldman argument. Right. So with regard to that issue, all plaintiff's damages were caused by the defendant's recording of three forged deeds. It was that act that caused the cloud to title, that caused the litigation, that resulted in the state court action. In no way does the district court case, in no way is the district court case being challenged by the, excuse me, in no way is the state court decision.